IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DEBORAH S. HERMAN, in her own right, :
and as Administratrix of the Estate of :
MICHAEL E. HERMAN,                    :      No.: 4:05-CV-2501
                                      :
            Plaintiff,                :
                                      :
      v.                              :      Judge Jones
                                      :
COUNTY OF YORK, et al.,               :
                                      :
            Defendants.               :

**MEMORANDUM AND ORDER**

**April 18, 2007**

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Two Motions are pending before this Court. First, two of the Defendants

("the County Defendants") in the above-captioned action, the County of York ("the

County") and Thomas Hogan ("Warden Hogan"), filed a Motion for Summary

Judgment on March 1, 2007. (Rec. Doc. 35). Second, the three remaining

Defendants ("the PHS Defendants"), Prison Health Services, Inc. ("PHS"), Tamara

Krzywulak,[1] and Kimberly Windon, filed a Motion for Summary Judgment on

_____

[1] In the Complaint and subsequent filings, Tamara Krzywulak was incorrectly named as
"S. Rijynlcyk," and she remains incorrectly identified as such on our docket. (Rec. Docs. 13, ¶
16; 44, Exh. 20). However, herein and henceforth, we will refer to her by the correct name,
Tamara Krzywulak.

March 1, 2007.  (Rec. Doc. 37).  For the reasons that follow, the Motions shall be granted in part and denied in part.

## PROCEDURAL BACKGROUND:

On December 5, 2005, Plaintiff Deborah Herman ("Plaintiff") filed her Complaint in the above-captioned action.  (Rec. Doc. 1).  By July 27, 2006, all Defendants had filed their Answers.  (See Rec. Docs. 3, 13).

On March 1, 2007, the County and Warden Hogan filed a Motion for Summary Judgment.  (Rec. Doc. 35).  On same date, PHS, Tamara Krzywulak, and Kimberly Windon filed their Motion for Summary Judgment.  (Rec. Doc. 37). Although only one (1) Reply Brief has been filed, the time in which to file the other has passed.  Thus, the Motions are ripe for disposition.

## STANDARD OF REVIEW:

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial."  Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992).  Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw

from them.  See Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir. 1982).

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial.  See id. at 325.

Rule 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e).  The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor.  See Celotex, 477 U.S. at 322-23.

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact."  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's

evidence contradicts the movant's, then the non-movant's must be taken as true."

Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d

Cir. 1992) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "As to materiality, the

substantive law will identify which facts are material."  Id. at 248.  A dispute is

considered to be genuine only if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Id.

**STATEMENT OF RELEVANT FACTS:**

Although the parties agree as to the general circumstances that led to the

filing of the instant action, they disagree about some of the particularities thereof.

Accordingly, in our disposition of the instant Motions, we will, where necessary,

view the facts and all inferences to be drawn therefrom in the light most favorable

to the non-moving party, Plaintiff.

On April 9, 2003, Michael Herman ("Herman" or "Decedent") attempted to

commit suicide multiple times.  (Rec. Doc. 44, P-17 at 1).  Because of the methods

by which he made his attempts, Herman was involuntarily committed to the York

4

Hospital for a period of ten (10) days and criminally charged with several offenses. (Rec. Docs. 44, P-17 at 1; 36, ¶ 1; 38, ¶ 1).

Following his release from the hospital, Herman pled guilty to the charges of burglary, theft, criminal mischief, and a firearms violation, all stemming from the events of April 9, 2003.  As a result, on September 4, 2003, the Honorable Penny Lee Blackwell of the York County Court of Common Pleas sentenced Herman to serve six (6) to twenty-three (23) months.  (Rec. Docs. 36, ¶ 1; 38, ¶ 1).  On same date, Judge Blackwell approved Herman to serve the aforementioned sentence on house arrest and probation.  (See Rec. Docs. 36, ¶ 1; 38, ¶ 1).  However, because Herman did not comply with the terms of probation, on December 23, 2003, Judge Blackwell sentenced him to serve his six (6) to twenty-three (23) months at the York County Prison ("YCP"), and Herman was committed to YCP.  (Rec. Docs. 36, ¶ 2; 38, ¶ 2).  Notably, the sentencing Order included language requiring a mental health evaluation.  (Rec. Doc. 36, Exh. 1).

Upon Herman's admission to YCP on December 23, 2003, Corrections Officer Stough ("CO Stough") completed a form entitled "Intake Medical Screen" regarding Herman.  (Rec. Doc. 44, Exh. P-1).  Therein, CO Stough indicated: 1) that based on his observations, Herman's "behavior/appearance" did not suggest a risk of suicide; 2) that Herman reported attempting suicide six (6) months prior;

and 3) that Herman reported taking Depakote and Wellbutrin, two anti-depressants. (Rec. Doc. 44, Exh. P-1).

Sometime thereafter on December 23, 2003, Kimberly Windon ("Nurse Windon"), a licensed practical nurse ("LPN") employed by PHS who worked at YCP, talked with Herman and completed a form entitled "Admission Medical Evaluation."[2]  (Rec. Docs. 36, ¶ 4; 38, ¶ 4; 37; Exh. B).  During their discussion, Herman indicated that he had made at least one suicide attempt within the past six (6) to seven (7) months; that he had been hospitalized for psychiatric reasons; that he suffered from mental illness, namely attention deficient hyperactivity disorder ("ADHD") and bi-polar disorder (doc. 37, Exh. B); and that although he had been taking Depokote and Wellbutrin, he had run out of them one (1) month prior and had taken none since.  (Rec. Docs. 36, ¶¶ 5-6; 37, ¶¶ 6-7; 38, ¶¶ 5-6; 39, ¶¶ 6-7). However, Herman denied current suicidal ideation.  (Rec. Docs. 37, ¶ 6; 39, ¶¶ 6-7).  Nevertheless, Herman's self-reporting caused Nurse Windon to characterize Herman as an emergent priority, meaning YCP's policy required that he be seen for a mental health evaluation within five (5) days.  (Rec. Docs. 36, ¶ 9; 38, ¶ 9).

Notably, the parties dispute whether CO Stough or Nurse Windon were

---

[2] When Windon talked with Herman, she had the "Intake Medical Screen" form, completed by CO Stough, available to her.  (Rec. Docs. 36, ¶ 4; 38, ¶ 4).

qualified to perform the so-called "screening" of Herman that one or both of them conducted on December 23, 2003.  However, it appears quite clear to this Court that their meetings with, and preparation of forms regarding, Herman constitute, at a minimum, attempt(s) to comply with that portion of YCP's suicide prevention policy that required all inmates to be screened immediately following their admission, and prior to their classification and release into any particular section of the prison.  (Rec. Doc. 44, Exh. P-12 at 5).

On December 24, 2003, because of Nurse Windon's December 23, 2003 referral (docs. 36, ¶ 7; 38, ¶ 7), and in accordance with YCP's policies and procedures (docs. 36, ¶ 10; 38, ¶ 10), Herman was seen by a so-called mental health nurse, Tamara Krzywulak ("Nurse Krzywulak"), also an LPN and an employee of PHS who worked at YCP.  (Rec. Docs. 37, ¶ 8; 39, ¶ 8).  During their meeting, Herman indicated that he was stable without medication and did not wish to take it, and he again denied being depressed or having suicidal thoughts.  (Rec. Docs. 37, ¶ 9; 39, ¶ 9).   As a result of her meeting with Herman, Nurse Krzywulak completed a form entitled "Referral for Psychological Services," wherein she assessed Herman as being oriented "x3" and calm.  (Rec. Doc. 37, Exh. C).

During his meeting with Nurse Krzywulak, Herman also requested placement in the general population.  (Rec. Docs. 37, ¶ 10; 39, ¶ 10).  However,

although Herman was nineteen (19) years of age, he looked younger, so Nurse
Krzywulak "cleared" Herman to the juvenile housing area rather than the general
population.  (Rec. Docs. 37, ¶ 10; 39, ¶ 10).  She also encouraged him to return for
mental health services if necessary.  (Rec. Docs. 36, ¶ 13; 36, ¶ 13).  Thus, on
December 24, 2003, following Nurse Krzywulak's so-called "clearing," Herman
was reclassified to NE 1A, and placed in that portion of YCP.  (Rec. Docs. 36, ¶
26; 38, ¶ 26).

The following day, on December 25, 2003, Herman's aunt, Brenda Doucette
("Doucette"), and other family members visited Herman, and he did not appear to
them to be depressed or at risk of hurting himself.  (Rec. Docs. 37, ¶ 11; 39, ¶ 11).
Specifically, Doucette testified that she did not ask Herman whether he was taking
medications, but that she was "encouraged" by him.  Doucette further testified that
"Michael always had a habit of making me think he was going to do better, and I
was encouraged because I thought he would."  (Rec. Docs. 37, ¶ 12; 39, ¶ 12; 37,
Exh. E at 28).

Four (4) days after his placement in NE 1A, on December 28, 2003, Herman
met with his counselor,[3] Veersammay Carpen ("Counselor Carpen"), and reported

---

[3] We note that in this context, we assume that the title of "counselor" does not denote any
sort of medical or psychological education.

that he did not have any problems in the North Block.  Rather, "he said, that coming to prison is like taking a long vacation.  He has nothing to worry about.  He sleeps when he wants to and watch[es] tv when he wants to.  He said, that he is doing good.  He did not have any concerns or questions."  (Rec. Docs. 36, ¶ 27; 36, Exh. 5; 38, ¶ 27).  Moreover, neither Counselor Carpen, Warden Hogan, nor Corrections Officer Jorge Alvarez ("CO Alvarez") had noted anything that indicated that Herman may have been suicidal.  (Rec. Docs. 37, ¶ 14; 39, ¶ 14).

Herman was again visited by his family on January 1, 2004.  (Rec. Docs. 37, ¶ 13, 39, ¶ 13).  Indeed, Herman's mother, Plaintiff herein, testified that looking back on it now, she can "absolutely not" recall any indication that Herman was suicidal when she saw him on said date.  (Rec. Docs. 37, ¶ 13; 39, ¶ 13; 37, Exh. F at 75).

On January 5, 2004, another employee of PHS, Nurse Bev Hamrick ("Nurse Hamrick") conducted an initial physical examination of Herman.  (Rec. Docs. 37, ¶ 15; 39, ¶ 15).  She assessed Herman's medical status as alert and oriented "x3," but recorded a bi-polar history.  (Rec. Docs. 37, ¶ 15; 39, ¶ 15).  There was nothing else out of the ordinary concerning the physical examination.  (Rec. Docs. 37, ¶ 15; 39, ¶ 15).

However, on January 6, 2004, CO Alvarez was summoned to the North

Block because of an altercation between Herman and another inmate.  (Rec. Docs. 37, ¶ 16; 39, ¶ 16).  Herman admitted striking the other inmate with a bar of soap in a sock, and may have indicated that an altercation had also occurred between the two inmates the prior evening.  (Rec. Docs. 36, ¶ 29; 37, ¶ 16; 39, ¶ 16).  As a result of the altercation(s), disciplinary proceedings were initiated against both inmates for fighting, and Herman was sent to YCP's medical facility for evaluation of a minor injury.  (Rec. Docs. 37, ¶ 16; 39, ¶ 16).  Accordingly, Nurse Margie Spangler ("Nurse Spangler") examined Herman, treated a one-inch scratch on his neck, and advised Herman to come back if he had any further problems.  (Rec. Docs. 36, ¶ 33; 37, ¶ 17; 38, ¶ 33; 39, ¶ 17).

Also as a result of the altercation(s), on January 6, 2004, Captain John Daryman ("Captain Daryman") directed that Herman be placed in the behavior adjustment unit ("BAU"), and he was so placed.  (Rec. Docs. 36, ¶ 34; 37, ¶ 18; 38, ¶ 34; 39, ¶ 18).  It is undisputed that Captain Daryman, unaware that Herman was suicidal, decided that Herman should be placed in a BAU cell by himself because he believed that such placement would be safer for Herman.  (Rec. Docs. 36, ¶ 37; 37, ¶ 18; 38, ¶ 37; 39, ¶ 18).  Captain Daryman has explained that he made this decision "due to his [Herman's] physical appearance.  As I stated earlier, he looked – I treated him like a juvenile.  I wanted to keep him by himself away from

stronger inmates for his own safety."  (Rec. Docs. 36, ¶ 35; 38, ¶ 35; 36, Exh. 9).

Indeed, although another inmate had been in the BAU cell where Herman was

initially placed, the second inmate was removed because that inmate was older and

stronger than Herman.  (Rec. Docs. 36, ¶ 36; 38, ¶ 36).

When Captain Daryman ordered Herman's placement in the BAU, he knew

that YCP's policies and procedures required that inmates in the BAU be checked

every half-hour.  (Rec. Docs. 36, ¶ 38; 38, ¶ 38).  However, as Plaintiff indicates,

the Deputy Warden of Treatment at YCP, Roger Thomas ("Deputy Warden

Thomas"), testified that prior to January 6, 2003, although officers working the

second and third shifts in the BAU were required to record such checks on a so-

called "detex strip," officers working the first shift on the BAU were not required

to so record "[b]ecause the officers are much more busy during the day."  (Rec.

Docs. 38, ¶ 38; 44, Exh. P-22 at 9, 22).  Accordingly, the BAU record from

January 6, 2004, documents no cell checks at all times relevant hereto.  (Rec. Doc.

44, Exh. P-29).  Thus, the extent to which any of these required checks were done

on January 6, 2004 appears to be a question of fact.

Later in the day on January 6, 2004, Herman was found hanging by a sheet

attached to the top bunk of his BAU cell.  (Rec. Docs. 37, ¶ 19; 39, ¶ 19).

Emergency efforts to resuscitate him were performed, unsuccessfully, and at 4:19

11

p.m. on January 6, 2004, Herman was pronounced dead.  (Rec. Docs. 37, ¶ 19; 39, ¶ 19).

In light of the events preceding Herman's death, background on the conduct of affairs at YCP is also required for our disposition of the instant Motion.  Among the topics that may bear on our disposition include the relationship between YCP and PHS, as well as other third-parties; and YCP and PHS's policies and procedures regarding suicide prevention, as well as reaction thereto.  Accordingly, we review such information below.

First, we note that at the time of Herman's suicide, Warden Hogan was in charge of the administration of YCP.  (Rec. Docs. 36, ¶ 46; 38, ¶¶ 46-52).  However, a separate entity termed the "Prison Board," made up of numerous public officials, inter alia, directly employed the Warden and played some role in the establishment of YCP's policies and procedures.  (Rec. Docs. 36, ¶¶ 48-52; 38, ¶¶ 46-52).  Significantly, the parties disagree as the exact roles of the Warden and the Prison Board in establishment of YCP's policies and procedures.  For example, the County and Warden Hogan contend that the Prison Board "determines the policies, adopts policies, and changes policies (doc. 36, ¶ 51), but Plaintiff contends that the Prison Board merely ratifies policies set by the Warden (doc. 38, ¶¶ 46-52).

Additionally, at the time of Herman's suicide, PHS was a contracting healthcare provider at YCP (docs. 36, ¶ 41; 38, ¶ 41), and both YCP and PHS had written suicide prevention policies.  (Rec. Docs. 36, ¶¶ 39, 41; 38, ¶¶ 39, 41). Among other things, YCP's policy required that each county employee receive two (2) hours of initial suicide prevention training and one (1) hour of annual training in suicide prevention.  (Rec. Docs. 36, ¶ 39; 38, ¶ 39).  Both CO Alvarez and Captain Daryman had received this training.  (Rec. Docs. 36, ¶ 39; 38, ¶ 39).  As noted above, YCP's policy also required that all inmates be screened upon admission to determine whether they had suicidal tendencies.  (Rec. Docs. 36, ¶ 41; 44, Exh. P-12 at 5).  However, said policy did not specify the qualifications required of the individuals conducting such screening.  (Rec. Doc. 44, Exh. P-12 at 5).  PHS's suicide prevention policies and procedures also required inmates to be screened for suicidal tendencies upon admission to YCP.  (Rec. Docs. 36, ¶ 41; 38, ¶ 41).

The parties disagree fiercely, however, as to the degree to which YCP and PHS's policies were actually implemented in the days leading up to Herman's suicide.  (See, e.g., Rec. Doc. 38, ¶ 41).  In support of the argument that their practices were sufficient, Defendants cite their expert's report, which concluded, "York County Prison and Prison Health Services had established policies and

procedures related to suicide prevention that were adequate and compliant with national standards . . . ."  (Rec. Doc. 36, ¶ 60; Exh. 18 at 8).

However, Plaintiff maintains that Defendants failed to implement their policies in at least two significant ways, enabling Herman's completed suicide attempt to occur.  First, Plaintiff contends that CO Stough, Nurse Windon, and Nurse Krzywulak did not have the proper education or experience to effectively "screen" Herman for suicidal tendencies upon his arrival at YCP.  Most pertinently, Plaintiff appear to take issue with several facts surrounding the evaluation of Herman by the so-called mental health nurse, Nurse Krzywulak, including, <u>inter alia</u>: 1) Nurse Krzywulak herself testified that she takes an estimated six hundred (600) referrals per month; and 2) following her evaluation of Herman, Nurse Krzywulak reported her findings to the forensic mental health counselor at YCP, Pat Gallagher, who had a Master's Degree and was a licensed professional counselor.  (Rec. Docs. 36, ¶¶ 19, 21; 38, ¶¶ 19, 21).  Plaintiff finds it troubling that the counselor with the Master's Degree never evaluated Herman personally.  Notably, the parties also disagree as to the amount of on-the-job training that Nurse Krzywulak received to help her complete her mental health assessments.  (Rec. Docs. 36, ¶ 20; 38, ¶ 20).  Second, Plaintiff notes that the failure to maintain a record of the checks upon Herman following his placement in

the BAU cell by himself, as well as the circumstances surrounding his death,[4]

indicate that the checks, supposed to be performed every half-hour, were not.

Following Herman's suicide, Deputy Warden Thomas undertook an

investigation into the suicide.  (Rec. Docs. 36, ¶ 42; 38, ¶ 42; 44, Exh. P-13).  Not

unexpectedly, the parties disagree as to the most relevant portions of the

Memorandum from Deputy Warden Thomas to Warden Hogan ("the

Memorandum"), which details the results of his investigation.  The County and

Warden Hogan point out that the Memorandum indicates that in January of 2004,

the estimated number of prisoners who would have been admitted that month was

one thousand (1000), and that in the preceding year, an estimated twelve thousand

(12,000) would have been admitted, and that, pursuant to the County's suicide

prevention policy, each of these inmates would have been screened for suicidal

thoughts.  (Rec. Docs. 36, ¶ 44; 38, ¶ 44; 44, Exh. P-13).  These Defendants also

note that the Memorandum indicates that prior to Herman's suicide, the last

completed suicide at YCP took place on August 24, 1997, about six (6) years and

four (4) months earlier.  (Rec. Docs. 36, ¶ 45; 38, ¶ 45; 44, Exh. P-13).  However,

Plaintiff notes that Deputy Warden Thomas also pointed out that Herman was not

---

[4] Evidence in the record suggests that Herman may have had sufficient time to endeavor to hang himself with two different items: first, his shoelaces, which apparently broke, and second, the  sheet from which he was found hanging.

seen by a "Masters level mental health professional," and that YCP does not know

exactly when Herman died because records were not kept of the checks on BAU

cells.  (Rec. Docs. 38, ¶¶ 42-43; 44, Exh. P-13).

## DISCUSSION:

Plaintiff has brought several claims arising out of the suicide of her son.

First, Plaintiff's Complaint brings three (3) 42 U.S.C. § 1983 ("§ 1983") claims.

(Rec. Doc. 1).  All allege violations of the Eighth and Fourteenth Amendment

rights of her son and herself: Count I is a claim against all Defendants for

deliberate indifference; Count II is a claim against the County and Warden Hogan

for "Constitutionally defective practices, policies, and procedures;" and Count III

is a claim against PHS for unconstitutional practices, policies and procedures.

Plaintiff's Complaint also brings one additional federal claim: Count V is an

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., claim

against the County and Warden Hogan.  Finally, Plaintiff brings three claims

grounded in Pennsylvania state law: Count IV is a professional negligence claim

against PHS, Nurse Windon, and Nurse Krzywulak; Count VI is a survival claim

against all Defendants, see 42 Pa. C.S. § 8302; and Count VII is a wrongful death

claim against all Defendants, see 42 Pa. C.S. § 8301.

Both Motions for Summary Judgment seek entry of an Order in Defendants'

16

favor on all claims.  (See Rec. Docs. 35, 37).

**A.      The viability of the County and Warden Hogan as Defendants**

We begin our analysis of the instant Motions by considering the arguments

set forth by the County and Warden Hogan that they should be dismissed from this

action generally.

First, we consider the County Defendants' argument that the County is not

an appropriately named defendant because 61 P.S. § 408 states that "the safe-

keeping, discipline, and employment of prisoners, and the government and

management of said institution [the county prison], shall be <u>exclusively</u> vested . . .

" in the board created thereby, the Prison Board.  61 P.S. § 408(a)(1) (emphasis

added).  Accordingly, no vicarious liability can be imposed upon the County for

injuries caused by employees of the Prison Board who are acting within the scope

of their employment.  <u>Nonemaker v. County of York</u>, 435 A.2d 675, 677 (Pa.

Commw. Ct. 1981).

However, as Plaintiff accurately notes, despite 61 P.S. § 408(a)(1), the

County can be held liable for the acts of its agents.  <u>Nonemaker</u>, 435 A.2d at 677.

The County Defendants appear to recognize this possibility (see doc. 47 at 7 ("[i]f

the County, by contracting with PHS, establishes some common law potential for

liability . . . ")), and they fail to articulate a reason or reasons that PHS Defendants

were not agents of the County.[5]  (See Rec. Doc. 47 at 6-8).  Moreover, factual

disputes remain as to roles that the Prison Board and Warden Hogan play in the

ratification of YCP policies, and this will determine whether an agency relationship

may also exist between YCP and Warden Hogan and, thus, whether he, a Prison

Board employee, was acting within the scope of that employment at all times

relevant hereto.  (Rec. Docs. 36, ¶ 51; 38, ¶ 46-52).  Accordingly, we cannot

determine whether Warden Hogan was acting as a agent of the County at any time

relevant hereto.  Because we cannot determine whether PHS employees or Warden

Hogan were acting as agents of the County, we will not dismiss the County from

the instant action at this time.

　　　Thus, we turn to the County Defendants' arguments that Warden Hogan

should be dismissed from the instant action because 1) he "does not possess final

policy making authority under state law" (doc. 35 at 11); 2) he did not personally

participate in any of the alleged wrongs, and respondeat superior is not a valid

basis for a § 1983 claim; and 3) he is entitled to qualified immunity.  We find all of

these arguments as to Warden Hogan unpersuasive at this time because once again,

the factual disputes surrounding Warden Hogan's role in the ratification of YCP

---

[5] As we have not been fully briefed on the existence of an agency relationship between
the County and the PHS Defendants, we offer no opinion on the existence or non-existence
thereof at this time.

policies precludes the granting of judgment in his favor on these bases.  (Rec. Doc. 35 at 11).

## B.    Plaintiff's § 1983 Claims

Next, we turn to consideration of Plaintiff's three (3) § 1983 claims.  The logical starting point of our analysis for these claims is the text of § 1983.  It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

"[I]n any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated."  County of Sacramento v. Lewis, 523 U.S. 833, 841 (1998).  As the Supreme Court reiterated in United States v. Lanier, and Lewis, 523 U.S. at 843, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  Lanier, 520 U.S. 259, 272 n.7 (1997) (citing Graham v. Connor, 490 U.S. 386, 394 (1989)).  As all of

Plaintiffs' § 1983 claims are covered by the Eighth Amendment, we analyze them in light of the Eighth, rather than Fourteenth, Amendment.[6]  See, e.g., Lewis, 523 U.S. at 843.

Accordingly, we next consider the text of the Eighth Amendment.  It provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend VIII.

Within this Circuit, considerable authority exists on the parameters of the Eighth Amendment's application to claims arising from suicides in prisons. Significantly, in two decisions arising out of the same action, the Court of Appeals for the Third Circuit held that:

> a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the [decedent] had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability.

Colburn v. Upper Darby Twp., 946 F.2d 1017 (3d Cir. 1991) ("Colburn II").  See also Colburn v. Upper Darby Twp., 838 F.2d 663 (3d Cir. 1988) ("Colburn I").

---

[6] We note that had Herman committed suicide during a pretrial detention, any claims arising therefrom would have been cognizable only under the Fourteenth Amendment, and our analysis would have proceeded accordingly.  See Woloszyn v. County of Lawrence, 396 F.3d 314, 320 n.5 (3d Cir. 2005).  However, any differences in the jurisprudence interpreting the Eighth and Fourteenth Amendments are immaterial for our purposes here because when confronted with such tragic circumstances as these, the Court of Appeals for the Third Circuit has looked to Eighth Amendment jurisprudence during its determination as to Fourteenth Amendment claims.  See id.

However, <u>Woloszyn</u>, 296 F.3d 314, the Third Circuit's most recent published decision on this issue, provides us perhaps the most guidance because the claims considered therein are similar to some of those brought in the instant action: a § 1983 claim alleging, at least in part, that the policies, procedures, and training were unconstitutionally inadequate, and pendent state law claims under Pennsylvania's Wrongful Death and Survival statutes.  <u>Id.</u> at 316, 319.

In <u>Woloszyn</u>, the Third Circuit highlighted developments in the law on this issue that followed <u>Colburn II</u>, namely those principles established in <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), and <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001).  Specifically, the Third Circuit explained that in <u>Farmer</u>, the Supreme Court elaborated on the culpability required to support liability under the Eighth Amendment:

> A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and <u>he must also draw the inference</u>.

<u>Woloszyn</u>, 396 F.3d at 321 (quoting <u>Farmer</u>, 511 U.S. at 837) (emphasis added).

The Third Circuit added that it "placed the following gloss" on <u>Farmer</u> in <u>Beers-Capitol</u>:

> To be liable on a deliberate indifference claim, a . . . prison official must

21

> both know of and disregard an excessive risk to inmate health or safety.  The
> . . . element of deliberate indifference is subjective, not objective . . .
> meaning that the official must actually be aware of the existence of
> excessive risk; <u>it is not sufficient that the official should have been aware</u>.
> However, subjective knowledge on the part of the official can be proved by
> circumstantial evidence to the effect that the excessive risk was so obvious
> that the official must have known of the risk.  Finally, a defendant can rebut
> a prima facie demonstration of deliberate indifference either by establishing
> that he did not have the requisite level of knowledge or awareness of the
> risk, or that, although he did know of the risk, he took reasonable steps to
> prevent the harm from occurring.

<u>Woloszyn</u>, 396 F.3d at 321 (quoting <u>Beers-Capitol</u>, 256 F.3d at 133) (emphasis added).

In Count I, Plaintiff brings deliberate indifference claims against all Defendants.  Thus, when considering Plaintiff's deliberate indifference claims against the PHS Defendants, which provided medical treatment to the inmates at YCP, we must also consider that "[i]n order to state a cognizable claim, a prisoner must allege facts or omissions sufficiently harmful to evidence a <u>deliberate indifference</u> to serious <u>medical needs</u>."  <u>Estelle v. Gamble</u>, 429 U.S. 96, 105-06 (1976) (emphasis added).  <u>See also</u> <u>Wilson v. Seiter</u>, 489 U.S. 1024, 1028 (1991). Moreover, it is well established that as long as a healthcare provider exercises professional judgment, his or her behavior will not violate a prisoner's constitutional rights.  <u>Brown v. Chambersburg</u>, 903 F.2d 274, 278 (3d Cir. 1990) (citing <u>Youngberg v. Romeo</u>, 457 U.S. 307, 322-23 (1982)).

Our review of the above authority on deliberate indifference claims and the record in this case lead us to conclude that Count I should be dismissed as to all Defendants.  We so conclude because Plaintiff's two (2) essential arguments for liability fail to support the continued viability of Count I.

First, Plaintiff makes much of the fact that the thirty (30) minute checks on Herman, which were required by YCP policy following his placement in the BAU cell, were not documented, and, thus, may not have occurred.  Notably, however, Plaintiff *failed to sue* any of the Corrections Officers who allegedly failed to check on Plaintiff.  Were any deliberate indifference claim to arise from the alleged failure to perform such checks, appropriate defendant(s) would have been the officer(s) who failed to conduct them.  By not naming any such defendants here, Plaintiff has waived the right to bring a deliberate indifference claim stemming from any alleged failure to conduct the thirty (30) minute checks.  Accordingly, we will dismiss Count I as against the County and Warden Hogan.

Second, Plaintiff argues that the PHS Nurses who met with Herman, pursuant to YCP and PHS's suicide prevention policies, failed to properly treat Herman given their awareness of his previous suicide attempts.  We find this argument unpersuasive for two (2) reasons.  First, the argument is undercut by another of Plaintiff's arguments, that Nurse Windon and Nurse Krzywulak were

23

not qualified to perform such assessments and that Herman should have been seen by a counselor with a Master's Degree.  If, as Plaintiff suggests, neither of these two (2) LPNs were qualified to evaluate Herman's condition, then they necessarily could not have been deliberately indifferent when their supposed lack of knowledge led them to conclude, as they did, that he was not at risk of committing suicide.

Second, we find that Nurse Windon and Nurse Krzywulak were exercising their professional judgment in their evaluation and ultimate "clearing" of Herman to the juvenile section of YCP, and, thus, they did not violate Herman's constitutional rights when making determinations as to his care.  Brown v. Chambersburg, 903 F.2d at 278.  The only decision for which Plaintiff could fault Nurses Windon and Krzywulak was failing to place Herman on suicide watch. However, in the face of his repeated denials of suicidal ideation (docs. 37, ¶¶ 6, 9; 39, ¶¶ 6-7, 9), and, indeed, his own family's testimony that they did not suspect that he was suicidal on either December 25, 2003 (docs. 37, ¶¶ 11-12; 39, ¶¶ 11-12), or January 1, 2004 (docs. 37, ¶ 13; 39, ¶ 13), we see no reason that their decision not to place Herman on suicide watch would fall outside of their professional judgment.  In fact, Nurse Windon's referral of Herman to Nurse Krzywulak (docs. 36, ¶ 7; 38, ¶ 7), and Nurse Krzywulak's "clearing" of Herman

to the juvenile section of the prison (docs. 37, ¶ 10; 39, ¶ 10), demonstrate that both of these PHS employees took actions to address their concerns about Herman's safety.   Thus, we will also dismiss Count I as against all three of the PHS Defendants.

Further, we note that, on this record, Plaintiff's arguments in favor of the continued viability of her deliberate indifference claims against all five (5) Defendants seek to impose an unrealistic burden upon not only YCP, but this nation's prison systems in their entirety as well, together with those providing care to the inmates therein.  Indeed, in the face of a growing prison population, it is our view that YCP's staff went to great lengths in an attempt to provide for his protection: from Nurse Windon's referral to Nurse Kryzwulak, to Nurse Kryzwulak's "clearing" of him to the juvenile section of the prison and Captain Daryman's efforts to protect him from more experienced inmates.  That these steps were ultimately in vain is tragic, but not the result of any deliberate indifference. We will not, then, conflate Plaintiff's deliberate indifference claims with her elsewhere expressed policies, practices, and procedures claims, despite Plaintiff's arguments that seek to have us do just that.

And so it follows that Counts II and III, Plaintiff's § 1983 claims that the County and Warden Hogan, and PHS, respectively, had policies, practices, and

procedures which deprived Herman of his Eighth Amendment rights, remain

viable.  In <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658

(1978), the Supreme Court established that municipalities can be liable for those

policies that cause a constitutional tort, <u>id.</u> at 691, and the PHS Defendants concede

that this provision for municipality liability extends to municipal contractors (<u>see</u>

doc. 37 at 26).  In fact, the parameters of <u>Monell</u> liability have also been expanded

to render municipalities liable not only for their official <u>policies</u>, but also for

courses of conduct that have become so permanent and well-settled as to qualify as

<u>customs</u>.  <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996) (quoting

<u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (emphasis

added)).

In the instant action, factual disputes as to the role that Warden Hogan

played in the adoption of YCP policies, and the extent to which Corrections

Officers checked on Herman following his placement in the BAU cell by himself,

prevent the entry of summary judgment on Count II.  Moreover, a determination as

to the credibility of the competing experts' views on whether Herman's history

should have required evaluation by a counselor with a Master's Degree, relevant to

both Counts II and III, is one properly left for a jury.  Accordingly, we will deny

summary judgment as to Counts II and III.[7]

## C.    Plaintiff's ADA Claims

Next, we turn to Plaintiff's ADA claims, brought under 42 U.S.C. § 12132

("§ 12132"), which provides:

> Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (emphasis added).  Although the parties disagree with respect to

what Plaintiff must show to establish a prima facie case pursuant to § 12132, and,

thus, whether Plaintiff has shown one, a recent Third Circuit decision cited by

Plaintiff outlines the elements that a plaintiff must show thereunder:

> (1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability.

Bowers v. NCAA, 475 F.3d 524, 553 n.32 (3d Cir. 2007) (emphasis added).[8]

---

[7] As is generally the case, we offer no opinion on the likelihood of success on any of Plaintiff's claims.  Rather, our task in disposing of the instant Motion is simply to determine which questions should be left for a jury.

[8]  The parties raise an interesting issue: whether an accommodation request is also required in order for a plaintiff such as ours to succeed in the prosecution of § 12132 claims. However, in light of the clear standard set forth by the Third Circuit in Bowers and the absence of controlling authority on this particular issue, we need not make such a determination at this juncture.

Here, Plaintiff's ADA claims fail because even assuming <u>arguendo</u> that elements one (1) through three (3) have been shown, element four (4) has not been, and cannot be, proven.  Element (4) cannot be shown because Herman was not denied access to YCP's programs or services because of his disability.  Plaintiff appears to turn § 12132 on its head, as it is clear to us that, to the obvious extent that Herman suffered harm, it was not the result of a disability-related deprivation of benefits.  Rather, any such deprivation was a result of his own, repeated self-reports.  Indeed, it is undisputed that when questioned on at least two (2) separate occasions by individuals present in YCP to provide medical services to inmates, Nurses Windon (docs. 37, ¶ 6; 39, ¶ 6) and Krzywulak (docs. 37, ¶ 9; 39, ¶ 9), Herman denied thoughts of suicide.  It is also undisputed that Herman specifically told Nurse Krzywulak that he did not wish to take the anti-depressant medications which had been prescribed for him.  (Rec. Docs. 37, ¶ 9; 39, ¶ 9).  Finally, it is undisputed that even despite Herman's claims that he was doing fine without medication, Nurse Krzywulak told Herman to return to mental health services if necessary.  (Rec. Docs. 37, ¶ 10; 39, ¶ 10).  Accordingly, on this record, Plaintiff's ADA claims must be dismissed.

**D.      Plaintiff's Medical Malpractice Claims**

Finally, we turn our attention to Count IV, Plaintiff's medical malpractice

claims against PHS, Nurse Windon, and Nurse Krzywulak.  Defendants offer only

one argument in favor of the dismissal of these claims: that the Pennsylvania

Mental Health Procedures Act ("MHPA"), 50 P.S. § 7101, <u>et seq.</u>, renders them

immune from civil liability "in the absence of willful misconduct or gross

negligence . . . ."  50 P.S. § 7114(a).  In response, Plaintiff argues that the MHPA

does not grant Defendants immunity from the instant suit because their provision

of care to Herman does not bring them within the scope of the MHPA.

Specifically, Plaintiff relies upon a provision of the MHPA entitled "Scope of

Act," which provides:

> This act establishes rights and procedures for <u>all involuntary treatment</u> of
> mentally ill persons, whether inpatient or outpatient, and for <u>all voluntary
> inpatient treatment</u> of mentally ill persons.  "Inpatient treatment" shall
> include all treatment that requires full or part-time residence in a facility.
> For the purpose of this act, a 'facility' means any mental health
> establishment, hospital, clinic, institution, center, day care center, base
> service unit, community mental health center, or part thereof, that provides
> for the diagnosis, treatment, care or rehabilitation of mentally ill persons,
> whether as outpatients or inpatients.

50 P.S. § 7103 (emphasis added).

Neither party cites any case law in support of their arguments on the specific

issue of whether evaluation and/or treatment of an inmate with a history of mental

illness qualifies as "involuntary treatment" or "voluntary inpatient treatment," and,

indeed, we have found none.  Thus, we are left to interpret only the MHPA's text

and apply to it common sense and logic.  Our research on the MHPA revealed that
it contains a provision specifically addressing when a prisoner may be
involuntarily examined and/or treated pursuant to the MHPA.  50 P.S. § 7401
provides that "[w]henever a person who is charged with crime, or who is
undergoing sentence, is or becomes severely mentally disabled, proceedings may
be instituted for examination and treatment under the civil provisions of this act in
the same manner as if he were not so charged or sentenced."  50 P.S. § 7401.

    As Plaintiff has noted, there is no evidence in the record to suggest that any
proceedings for the involuntary examination and/or treatment of Herman were
instituted pursuant to the MHPA while he was incarcerated at YCP.  Quite to the
contrary, Nurse Windon and Nurse Krzywulak found Herman to be sufficiently
stable to be housed in YCP's general juvenile population, and those determinations
are some of the occurrences at YCP with which Plaintiff takes issue here.  In
addition, we fail to see how Herman's meetings with PHS employees constituted
"voluntary inpatient treatment" because his stay at YCP was not required for such
treatment, but, rather, any treatment at YCP was only the result of his incarceration
therein.  Thus, as no proceedings for Herman's involuntary examination or
treatment were instituted by YCP pursuant to the MHPA, and his interactions with
PHS employees at YCP were not in the course of any "voluntary inpatient

30

treatment," we fail to see how the MHPA can provide immunity to the PHS Defendants here.

Moreover, the PHS Defendants failed to argue that they are entitled to dismissal of the medical malpractice claims on their merits.  Accordingly, Plaintiff's medical malpractice claims against the PHS Defendants remain viable.[9]

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.     The County and Warden Hogan's Motion for Summary Judgment (doc. 35) is **GRANTED** in part and **DENIED** in part to the following extent:

   a.     The Motion is **GRANTED** to the extent that:

        i.     Count I is dismissed; and

        ii.     Count V is dismissed.

   b.     The Motion is **DENIED** in all other respects.

2.     PHS, Nurse Windon, and Nurse Krzywulak's Motion for Summary Judgment (doc. 37) is **GRANTED** in part and **DENIED** in part to the following extent:

   a.     The Motion is **GRANTED** to the extent that Count I is

_____

[9] For the sake of completeness, we note only that the continuing viability of some claims against all five (5) Defendants renders Plaintiff's wrongful death and survival actions against same Defendants viable as well.

dismissed.

b.    The Motion is **DENIED** in all other respects.




<u>s/ John E. Jones III</u>
John E. Jones III
United States District Judge